WACHTELL, LIPTON, ROSEN & KATZ, DAVID M. EINHORN, TAX MATTERS PARTNER, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wachtell, Lipton, Rosen & Katz v. Commissioner
Docket No. 14574-90
United States Tax Court
T.C. Memo 1992-392; 1992 Tax Ct. Memo LEXIS 408; 64 T.C.M. (CCH) 128; July 14, 1992, Filed *408 Decision will be entered under Rule 155. P is a general partnership engaged in the practice of law. Effective July 1, 1984, P adopted individual defined benefit plans for a majority of its partners. Each plan created a trust to provide for the investment and administration of the plan assets. For the taxable year at issue, 1986, all contributions to the plans were made within the time required by sec. 401(a)(1) and (6), and each of the plans and related trusts were qualified under sec. 401(a) and were exempt from taxation under sec. 501(a). The appropriate Forms 5500 and Schedules B were filed with the Service. R challenged various funding assumptions made by the plans' enrolled actuary in determining the amount of tax-deductible contributions for each plan for plan year 1986. Held: The actuarial assumptions made by the plans' enrolled actuary were reasonable in the aggregate and represented the actuary's best estimate of anticipated experience under the plans, as required by sec. 412(c)(3); accordingly, as the assumptions used were not substantially unreasonable, R is precluded from requiring a retroactive change of assumptions. For Petitioner: James P. Holden, Gerald *409 A. Kafka, David M. Einhorn, and Warren R. Stern. For Respondent: Catherine R. Chastanet, Theodore R. Leighton, Mark L. Hulse, Laurie B. Kazenoff, and Laurence D. Ziegler. CLAPP
CLAPP
MEMORANDUM OPINION CLAPP, Judge: This case is a partnership action for readjustment of partnership items under section 6226. Wachtell, Lipton, Rosen & Katz (WachtellLipton) is a general partnership engaged in the practice of law in New York City. On April 16, 1990, respondent issued a notice of final partnership administrative adjustment (FPAA) to disallow deductions of $ 7,062,204 claimed on the Wachtell Lipton partnership tax return for the year ended December 31, 1986. After concessions by the parties, the amount in dispute is $ 5,832,204. The issue for decision is whether actuarial assumptions used by the enrolled actuary for the individual defined benefit plans (IDB plans) of Wachtell Lipton's partners to determine the plans' costs were reasonable in the aggregate and represented the actuary's best estimate of anticipated experience under the plans, as required by section 412(c)(3). Specifically, respondent determined: (1) The 5-percent preretirement and postretirement interest rate assumption *410 used by the plans' actuary was unreasonably low; (2) the age 55 retirement assumption was unreasonably low; (3) the preretirement mortality assumption in a one person plan was unreasonable and, alternatively, the preretirement mortality assumption based upon the 1958 Commissioners' Standard Ordinary mortality table (1958 CSO mortality table) was unreasonable; and (4) the 7.5-percent preretirement and 5-percent and 7.5-percent postretirement expense load assumptions were unreasonable, and these assumptions were not offset by any other assumptions that would make the assumptions in the aggregate reasonable. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. Factual Background
The stipulation of facts and exhibits attached thereto are incorporated by reference. Wachtell Lipton is a general partnership organized under the laws of New York engaged in the practice of law. Wachtell Lipton has been in existence continuously since 1965. During the year in issue, Wachtell Lipton had 41 partners. During the year in issue, David M. Einhorn *411 (Einhorn) was the tax matters partner (TMP) of Wachtell Lipton. Wachtell Lipton filed its 1986 Federal partnership return of income on a calendar year basis using the cash method of accounting. Effective July 1, 1984, Wachtell Lipton adopted IDB plans for each of its partners. Under the terms of the plans, a participant would be provided a specified benefit when he or she retired. Under the terms of the plans as amended,a beneficiary was entitled to receive upon the preretirement death of the participant the proceeds of the life insurance policy that was to be purchased by the plan. Each of the plans purchased universal life insurance during the first plan year. Effective April 1, 1987, most of the plans reduced the amount of insurance coverage by obtaining a different insurance provider. The plans also provided that if a participant's active service with Wachtell Lipton was interrupted or terminated due to disability prior to the normal retirement date specified in the plan, the participant would continue to accrue retirement benefits and funding would continue during the period of disability. To satisfy this obligation, the plans purchased disability insurance. Each of *412 the plans established a trust to provide for the investment and administration of the plan assets. Each partner was appointed investment cotrustee of the trust and designated a cotrustee for his plan. Investments made by each plan were at the discretion of the trustees, subject to a general Wachtell Lipton policy prohibiting partners from investing directly in corporate debt and equity securities. For the 1986 plan year, Wachtell Lipton made contributions to the plans on behalf of its partners. Each of the plans and related trusts were qualified plans and trusts under section 401(a) and were exempt from taxation under section 501(a). The enrolled actuary for the plans for the 1986 plan year was Donald Segal (Segal), an employee of Wolper, Ross & Co. Ltd. (Wolper Ross). Segal used a 5-percent pre and postretirement interest rate assumption for the plans. He used a retirement age assumption of age 55 and 15 years of service. For those partners who were older than age 50 at the inception of the plans, Segal used a retirement age assumption of the later of 15 years of service or the fifth anniversary of plan participation but no later than age 65. Segal assumed preretirement mortality *413 pursuant to the 1958 CSO mortality table. Segal used 7.5-percent preretirement and 5-percent and 7.5-percent postretirement expense load assumptions. Segal signed the Schedules B "Actuarial Information" to the Forms 5500-R "Registration Statement of Employee Benefit Plan" with respect to each plan for the July 1, 1986, to June 30, 1987, plan year. He certified on the Schedules B that for each plan the assumptions used in the aggregate were reasonably related to the experience of the plan and to reasonable expectations, and represented his best estimate of the anticipated experience under the plan. Wachtell Lipton timely filed its Form 1065, U.S. Partnership Return of Income, for its taxable year ended December 31, 1986, with the Internal Revenue Service (Service). Effective December 1, 1988, Wachtell Lipton terminated all of the existing IDB plans and their related trusts, as pursuant to section 401(a)(26) they were to lose their qualified status effective for plan years beginning after December 31, 1988. On April 16, 1990, the Service mailed the TMP a notice of FPAA with respect to the taxable year ended December 31, 1986. On July 2, 1990, the TMP timely filed a petition for *414 readjustment of partnership items under section 6226 with respect to the adjustments set forth in the FPAA. Law
Each Wachtell Lipton plan was an individual defined benefit plan. A defined benefit plan provides a participant at retirement with the benefit stated in the plan. The costs of benefits payable from such plans are funded incrementally on an annual basis over the preretirement period. Secs. 404 and 412. Contributions made to the plans, within certain limits, are deductible. Sec. 404(a)(1). Wachtell Lipton funded each plan and passed through the deduction for such contributions to each partner. Earnings on the contributions are not taxed as they accumulate. Sec. 501(a). Plan assets are taxed to participants only as they are paid out as benefits. Sec. 402(a)(1). The amount estimated to fund a defined benefit plan is calculated by the plan's actuary and is determined based upon actuarial assumptions about a number of future events, such as rates of return on investments, the benefit commencement date, future earnings, and participant mortality, among other things. Section 404(a)(1)(A)(i) provides that the amount deductible by a taxpayer in any year shall be *415 determined using the actuarial assumptions that meet the requirements of section 412. At issue in this case is whether the assumptions made by the plans' actuary, in determining the amount of deductible contributions for each plan for plan year 1986, were reasonable in the aggregate and represented the actuary's best estimate of anticipated experience under the plans, as required by section 412(c)(3). Section 412(c)(3) is part of a statutory scheme designed to regulate pension plans, and provided as follows: (3) Actuarial assumptions must be reasonable. -- For purposes of this section, all costs, liabilities, rates of interest, and other factors under the plan shall be determined on the basis of actuarial assumptions and methods which, in the aggregate, are reasonable (taking into account the experience of the plan and reasonable expectations) and which, in combination, offer the actuary's best estimate of anticipated experience under the plan. Section 6059 requires that the administrator of a pension plan to which section 412 applies must enlist the services of an enrolled actuary to file an actuarial report for the plan's first year and every third year thereafter. This actuarial *416 report shall contain, inter alia, the actuary's funding methods and assumptions deemed necessary to fund the plan's costs and the actuary's certification that to the best of his knowledge the report is complete and accurate and that he has complied with the requirements of section 412(c). Sec. 6059(b). Section 7701(a)(35) defines an enrolled actuary as a person who is enrolled by the Joint Board for the Enrollment of Actuaries (Joint Board) established under the Employee Retirement Income Security Act (ERISA), Pub. L. 93-406, 88 Stat. 829, 1002. Sections 412(c)(3), 6059, and 7701(a)(35) were added to the Internal Revenue Code by ERISA sections 1013(a), 1033(a), and 3043, 88 Stat. 914, 947, and 1003, to apply for plan years beginning after December 31, 1975. ERISA had a significant impact on pension plans, and one of its objectives was to place reliance upon enrolled actuaries to assist plan fiduciaries in ensuring that pension plans would be able to provide earned benefits to participants when due. ERISA was enacted, in part, because the growth and development of the private pension system in the United States had been substantial since the forties. The legislative history of *417 ERISA provides: In 1940, an estimated four million employees were covered by private pension plans; in 1950, the figure had increased to almost 10 million and in 1960 over 21 million were covered. Currently, over 30 million employees or almost one half of the private non-farm work force are covered by these plans. This phenomenal expansion of coverage has been matched by an even more startling accumulation of assets to back the benefit structure. Today, in excess of $ 150 billion in assets are held in reserve to pay benefits credited to private plan participants. [H. Rept. 93-533 (1973), 1974-3 C.B. 210, 212.] However, regulation of the private pension system's scope and operation had been minimal. Although there have been significant legislative changes since the present basic framework of the tax laws relating to pensions was first adopted -- principally in allowing self-employed people to establish retirement plans for themselves and their employees and in requiring the disclosure of information regarding welfare and pension plans -- it has been more than 30 years since these basic pension provisions were first adopted. It is time for new legislation to *418 conform the pension provisions to the present day situation and to provide remedial action for the various problems that have arisen in the retirement plan area during the past three decades. [H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 236, 249.] The enactment of ERISA was a legislative attempt to assure equitable and fair administration of pension plans and to remedy problems that had arisen which prevented many of those plans from achieving their full potential as a source for retirement income. One of the most important matters of public policy facing the nation today is how to assure that individuals who have spent their careers in useful and socially productive work will have adequate incomes to meet their needs when they retire. This legislation is concerned with improving the fairness and effectiveness of qualified retirement plans in their vital role of providing retirement income. In broad outline, the objective is to increase the number of individuals participating in employer-financed plans; to make sure to the greatest extent possible that those who do participate in such plans actually receive benefits and do not lose their benefits as a result of *419 unduly restrictive forfeiture provisions or failure of the pension plan to accumulate and retain sufficient funds to meet its obligations; and to make the tax laws relating to qualified retirement plans fairer by providing greater equality of treatment under such plans for the different taxpayer groups concerned. [H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 243.] The enactment of ERISA mandated a cooperative effort whereby the Department of Labor (Labor) and the Department of the Treasury (Treasury) would jointly oversee the participation in and vesting and funding of pension plans, the reporting and disclosure requirements for pension plans, fiduciary standards, and plan termination insurance. In enacting ERISA, Congress was well aware that actuaries would play a major role in ensuring that retirement plans would be sufficiently able to provide retirement income when due. Throughout the reports of the Senate Finance Committee and the House Ways and Means Committee, Congress recognized the importance of the assumptions and methods chosen by actuaries in determining plan funding amounts. Congress also explicitly noted that such determinations by actuaries would *420 involve making predictions and would be a matter of judgment involving many factors and producing a range of results. In estimating pension costs, actuaries must make assumptions ("actuarial assumptions") about a number of future events, such as the rate of return on investments ("interest"), employees' future earnings, and employee mortality and turnover. Actuaries also must choose from a number of methods to calculate future plan liabilities. The amounts required to fund any given pension plan can vary significantly according to the mix of these actuarial assumptions and methods. As a result, the assumptions and methods used by actuaries are basic to the application of minimum funding standards for defined benefit pension plans. [S. Rept. 93-383 (1973), 1974-3 C.B. (Supp.) 80, 147; see also H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 262.)] Congress realized that making predictions and forecasts to determine plan funding costs was the professional duty and function of actuaries. [The House Ways and Means] committee recognizes that the amount required to fund a pension plan is in large part determined by actuaries' estimates of future plan *421 costs, which in turn are based on the actuarial methods and assumptions used for each plan. Consequently, the determination of the amount of contributions that must be made to a plan to adequately fund the plan benefits is significantly affected by the professional decisions of the plan's actuary. * * * [H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 309.] Accordingly, Congress decided that accepting a range of reasonableness for funding amounts for retirement plans would be more desirable and more effective than imposing an inflexible legislative standard on actuaries and, therefore, rejected imposing mandatory funding assumptions and methods. Congress acknowledged that actuaries are not charged with the responsibility of determining a "correct" set of assumptions, but with the responsibility of determining assumptions that fall within a range of reasonableness. Conceivably an attempt might be made to secure uniform application of the minimum funding standards by authorizing the Secretary of the Treasury or some other authority to establish the specific actuarial assumptions and methods that could be used by pension plans. That would involve, for example, setting *422 a specific rate of interest that could be used by certain pension plans or by specifying certain turnover rates for specified types of firms. However, the committee does not believe that this would be an appropriate procedure, since the proper actuarial assumptions may differ substantially between industries, among firms, geographically, and over time. Further, in estimating plan costs each actuarial assumption may be reasonable over a significant range and it would appear that the proper test would be whether all actuarial assumptions used together are reasonable. These considerations strongly indicate that any attempt to specify actuarial assumptions and funding methods for pension plans would in effect place these plans in a straitjacket so far as estimating costs is concerned, and would be likely to result in cost estimates that are not reasonable. [H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 262.] By deferring to the professional judgment of actuaries in the area of plan funding, Congress expressed its intent that actuaries be afforded a range of latitude in establishing a mix of reasonable assumptions, and that only if such assumptions are "substantially *423 unreasonable" should they be challenged and changed retroactively. Since the actuarial assumptions used must be reasonable in the aggregate, it is anticipated that, on audit, the Internal Revenue Service will (as presently) require a change of assumptions where they do not meet this standard. However, unless the assumptions used are substantially unreasonable, it is contemplated that generally the Service will not require a change of assumptions to be made effective for years prior to the year in which the audit is made. [H. Rept. 93-807 (1974), 1974-3 C.B. (Supp.) 330.] The language of the conference report adopted the rules relating to actuarial assumptions of the House Ways and Means bill, as amended by the Senate amendment, and the result was as follows: The conference substitute combines the rules relating to actuarial assumptions of the House bill and of the Senate amendment and requires that, for purposes of the minimum funding standard, all plan costs, liabilities, rates of interest, and other factors under the plan are to be determined on the basis of actuarial assumptions and methods which, in the aggregate, are reasonable. Actuarial assumptions are *424 to take into account the experience of the plan and reasonable expectations. These assumptions are expected to take into consideration past experience as well as other relevant factors. In addition, under the conference substitute, the actuarial assumptions in combination are to offer the actuary's best estimate of anticipated experience under the plan. * * * [H. Conf. Rept. 93-1280 (1974), 1974-3 C.B. 415, 445-446.] The conference report expresses the intent of Congress to place with enrolled actuaries the responsibility for arriving at reasonable assumptions regarding plan funding costs. These assumptions are to be based, inter alia, objectively on a plan's past experience and on the subjective professional judgment of an enrolled actuary regarding potential future plan experience. The actuary's assumptions should not be challenged and changed retroactively unless substantially unreasonable. We note that the requirement that assumptions used to determine plan funding costs be reasonable predates ERISA. The regulations accompanying section 404 state: In no event shall costs for the purpose of section 404(a)(1) exceed costs based on assumptions and methods *425 which are reasonable in view of the provisions and coverage of the plan, the funding medium, reasonable expectations as to the effects of mortality and interest, reasonable and adequate regard for other factors such as withdrawal and deferred retirement (whether or not discounted) which can be expected to reduce costs materially, reasonable expenses of operation, and all other relevant conditions and circumstances. * * * [Sec. 1.404(a)-3(b), Income Tax Regs.] Also, Rev. Rul. 63-11, 1963-1 C.B. 94, states the Service's position with respect to various methods of valuing assets and the proper interest rate to be used in valuing liabilities for computing costs in determining the limitations on deductions for employer contributions to pension plans under section 404. Respondent stated in the revenue ruling: However, it should be emphasized that, for the purpose of determining deductible limits, it is not essential that each individual assumption used be reasonable. It is merely required that the combination of all assumptions produces reasonable results. * * * [ Rev. Rul. 63-11, 1963-1 C.B. 94, 95.] Although the legislative *426 history of ERISA evidences congressional intent to rely exclusively on actuarial assumptions regarding plan funding costs -- such assumptions will be accepted if reasonable in the aggregate -- Congress did not permit actuaries unfettered liberty. To do so might invite the unprofessional selling of expertise to achieve tax-desired results rather than prudent plan funding. However, instead of imposing uniform and specific assumptions for pension plans, Congress decided to impose uniform standards for the qualification of actuaries. Congress recognized that there was no existing Government regulation of the actuarial profession as there was for other professions such as the medical, legal, and accounting professions. The Committee [on Labor and Public Welfare] is unaware of any significant licensing procedures for actuaries at either the state or federal level and this may, to some extent, explain inadequate funding procedures which have been found to exist. * * * [S. Rept. 93-127 (1973), 1974-3 C.B. (Supp.) 17.] Accordingly, Congress directed the Secretaries of Labor and of Treasury to establish a joint board which would create and administer standards for *427 enrollment of actuaries; enroll actuaries to practice before Labor and the Service; administer standards for disenrollment of actuaries; and write the appropriate regulations. See H. Conf. Rept. 93-1280 (1974), 1974-3 C.B. 523. By creating a system of actuarial certification, Congress could be satisfied that actuaries who performed services for qualified pension plans would meet an appropriate level of competence in choosing their funding methods and assumptions. The Joint Board is composed of three members appointed by the Secretary of the Treasury and two appointed by the Secretary of Labor. 20 C.F.R. sec. 900.3 (1991). ERISA sec. 3042(a), 88 Stat. 1002, provides that individuals performing actuarial services and applying for enrollment before the Joint Board on or after January 1, 1976, must satisfy the following standards and qualifications: (1) education and training in actuarial mathematics and methodology, as evidenced by -- (A) a degree in actuarial mathematics or its equivalent from an accredited college or university, (B) successful completion of an examination in actuarial mathematics and methodology to be given by the Joint Board, or (C) successful *428 completion of other actuarial examinations deemed adequate by the Joint Board, and (2) an appropriate period of responsible actuarial experience. * * * The Federal regulations governing the performance of actuarial services under ERISA prescribe rules for renewal of enrollment. Those regulations provide that as a condition for renewal, an individual enrolled to perform actuarial services under ERISA must periodically complete a minimum number of hours of continuing education courses. The content of such courses must be "designed to enhance the knowledge of an enrolled actuary with respect to matters directly related to the performance of pension actuarial services under ERISA or the Internal Revenue Code." 20 C.F.R. sec. 901.11(f) (1991). Examples of the subject matter of such courses are: Actuarial cost methods under ERISA, requirements with respect to the valuation of plan assets, requirements for qualification of pension plans, excise taxes related to the funding of qualified pension plans, economics, computer programs, pension accounting, investment and finance, and business and general tax law. Id.
ERISA sec. 3042(b), 88 Stat. 1003, provides that the Joint Board may, *429 after notice and an opportunity for a hearing, suspend or terminate the enrollment of an individual who fails to discharge his duties or does not satisfy the requirements for enrollment. Only persons who have satisfied the standards and qualifications for becoming an enrolled actuary may determine plan funding methods and assumptions under ERISA. ERISA requires that the administrator of a defined benefit plan retain on behalf of all plan participants an enrolled actuary to prepare an actuarial statement to be filed annually with the Secretary of Labor. ERISA sec. 103(a)(4)(A), 88 Stat. 842 (current version at 29 U.S.C. sec. 1023(a)(4)(A) (1988)). This actuarial statement is to contain, among other things, information pertaining to the plan year such as the normal costs, accrued liabilities, actuarial assumptions and methods used to determine costs, and the value of assets accumulated in the plan. The enrolled actuary also is required to make an actuarial valuation of the plan for every third plan year, or more frequently if deemed necessary. ERISA sec. 103(d), 88 Stat. 845, 846 (current version at 29 U.S.C. sec. 1023(d) (1988)). Section 6059, as added by ERISA sec. 1033, 88 *430 Stat. 947, requires each defined benefit plan to which section 412 applies to file for the first plan year and for each third plan year thereafter (or more frequently if the Secretary of the Treasury determines), a report prepared and signed by an enrolled actuary. Those reports shall contain: (1) a description of the funding method and actuarial assumptions used to determine costs under the plan, (2) a certification of the contribution necessary to reduce the accumulated funding deficiency (as defined in section 412(a)) to zero, (3) a statement -- (A) that to the best of his knowledge the report is complete and accurate, and (B) the requirements of section 412(c) (relating to reasonable actuarial assumptions) have been complied with, (4) such other information as may be necessary to fully and fairly disclose the actuarial position of the plan, and (5) such other information regarding the plan as the Secretary may by regulations require. [Sec. 6059(b)(1)-(5).] In summary, the statutory scheme for satisfying the provisions of section 412(c)(3) requires that an administrator of a pension plan engage the services of an enrolled actuary who determines the methods and assumptions *431 necessary to fund costs under the plan, and certifies that to the best of his knowledge such methods and assumptions are reasonable in the aggregate and represent his best estimate of anticipated experience under the plan. Upon audit by respondent, these actuarial assumptions may be determined to be unreasonable in the aggregate, and Wachtell Lipton has the burden of proving that the assumptions are reasonable in the aggregate. However, these actuarial assumptions will not be changed retroactively unless they are found to be substantially unreasonable. Accordingly, we shall now examine the various challenged assumptions. Experts
The following experts, whose reports and testimony will be discussed later in this opinion, appeared on behalf of Wachtell Lipton: James F. Rabenhorst (Rabenhorst), B.S., M.B.A., testified as to the validity of Wachtell Lipton's retirement age assumptions established by the plans' actuary. Rabenhorst is the managing partner of the national law firm consulting group at the accounting and consulting firm of Price Waterhouse. He also is chairman of the law firm services group at Price Waterhouse, a post he has held since 1979. He has been a partner *432 at Price Waterhouse since 1976, has been employed by Price Waterhouse since 1968, and has consulted with prominent law firms on a variety of management issues, including retirement policy, since 1969. Rabenhorst also is a member of the Economics of Law Practice Section of the American Bar Association and has written two monographs in that capacity. Mary S. Riebold (Riebold), F.S.A., [1] M.A.A.A., [2] E.A., [3] F.C.A., [4] testified as to the validity of all four actuarial assumptions established by the plans' actuary. Riebold has been a managing director of William M. Mercer, Inc., the world's largest actuarial consulting firm, since 1988, where her practice has focused exclusively on pension plans. She has worked in employee benefits for 23 years and in pensions for 17 years. Additionally, she has been a member of the pension section council of the Society of Actuaries since 1989, a member of the board of governors of the Society of Actuaries since 1990, a member of the board of directors of the American Academy of Actuaries since 1990, and a member of the board of directors of the Conference of Consulting Actuaries since 1984. Riebold served as treasurer of the Conference of Consulting *433 Actuaries from 1987 to 1990 and has been president of that organization since October 1991. *434 Richard R. Joss (Joss), B.S., M.A., Ph.D., F.S.A., M.A.A.A., E.A., testified with regard to the validity of all four actuarial assumptions. He has more than 16 years' experience as an actuarial consultant to pension funds, the last 11 years with the Wyatt Company (Wyatt), which he joined in 1981 as a cofounder of Wyatt's Seattle office. In August 1990, Joss was promoted to resource actuary in Wyatt's Washington, D.C., office. The resource actuary serves as the source for technical and practical advice in dealing with pension laws and regulations for each of the approximately 350 to 400 actuaries that Wyatt employs nationwide. He has coauthored a textbook on the application of mathematics to solving business problems. Steven H. Schechter (Schechter) earned a certificate degree in data processing and system design from Columbia University in 1982. He was employed at Bankers Trust until 1985 when he began working at Wolper Ross as business applications systems manager. In 1987, Schechter was promoted to director of management information systems, which involves the analyses of computer data on a regular basis. Schechter offered testimony as an expert in computer systems business *435 applications, providing analysis of Labor Form 5500 [5] data concerning interest rate assumptions established for small pension plans (those with fewer than 100 participants and those with 10 or fewer participants). John W. Peavy III (Peavy), B.B.A., [6] M.B.A., Ph.D., C.F.A.,[7] testified on behalf of Wachtell Lipton as a rebuttal witness. Peavy is professor of finance and Vaughan Roucher Professor of Financial Investments at Southern Methodist University. He was engaged in investment banking with Goldman, Sachs & Co. for 6 years and at present manages $ 200 million of clients' funds through his own firm, Diversified Investment Services. He has published several articles and books in the area of finance and has been retained in the past by the Service *436 as an expert witness. He offered testimony to rebut the contentions of respondent's experts, Shapiro and Haneberg, regarding the interest rate assumptions established by Segal, the plans' actuary. The following experts, whose reports and testimony will be discussed later in this opinion, appeared on behalf of respondent: Claude Poulin (Poulin), B.A., B. Comm., F.S.A., M.A.A.A., E.A., testified as to the validity of all four of Wachtell Lipton's actuarial assumptions established by the plans' actuary. He has been the president of Poulin Associates, Inc., an actuarial and benefits consulting firm based in Washington, D.C., since January 1980. His clients include individual plans, as well as those of many large corporations and labor unions. *437 From 1976 to 1980, Poulin was assistant director of the Social Security department of the United Auto Workers union, where he had worked since 1969. Ronald L. Haneberg (Haneberg), B.A., J.D., F.S.A., M.A.A.A., F.C.A., offered testimony as to the validity of all four actuarial assumptions established by Segal, the plans' actuary. Haneberg has been a self-employed consulting actuary since 1988, prior to which he was a consulting actuary with Buck Consultants (Buck), a prominent pension actuary firm, from 1977 to 1988. His experience with Buck was mostly with multiple-participant plans, the smallest of which might have included between 10 and 50 participants, not individual plans. In preparation for his testimony, Haneberg read "literally tens of thousands of pages of * * * [actuarial] materials and literature" on small plans. Alan C. Shapiro (Shapiro), B.S., M.A., Ph.D., testified as to the validity of the interest rate assumptions as an expert in finance and economics, not actuarial science. Shapiro is the Ivadelle and Theodore Johnson Professor of Banking and Finance, University of Southern California (USC). He has been a professor at USC for 14 years, has previously taught *438 at The Wharton School of the University of Pennsylvania, and has been a visiting professor at several universities worldwide. Shapiro conducts seminars in finance for executives, consults with several large industrial and service companies, and serves as a federally-appointed director of Lincoln Savings and Loan, a failed thrift institution. He has written four books, including a leading corporate finance textbook, and more than 50 articles in scholarly journals. William S. Borden (Borden), B.A., Ph.D., testified in rebuttal to Joss' testimony regarding actual rates of investment return for small and large plans relying on Form 5500 data obtained from Labor. Borden is a senior program analyst at Mathematica Policy Research (Mathematica), a position he has held since 1979. Mathematica conducts statistical evaluations of the effectiveness of Federal and State programs. In 1984, Borden was retained by Labor to create a research database of Form 5500 data from the original filings. Since that date, nearly all of his professional time has been devoted to analyzing Form 5500 data. Jeffrey F. Jaffe (Jaffe), B.A., M.B.A., Ph.D., offered an expert report on behalf of respondent as *439 to the validity of the interest rate assumption established by the plans' actuary; however, he did not testify. Jaffe has been an associate professor of finance at The Wharton School of the University of Pennsylvania since 1980. He is the author of more than 20 articles in scholarly journals and other publications. Interest Rate
Background
Segal, the plans' certifying actuary for the year at issue, established an interest rate assumption of 5 percent for both the pre and postretirement periods and used that rate to calculate the contributions for the year at issue. Respondent determined that an 8-percent interest rate pre and postretirement assumption should be used for Wachtell Lipton's plans for the year at issue. As with all of the actuarial assumptions, there is no single formula or set of criteria used by actuaries to establish interest rate assumptions. Actuaries consider the facts and circumstances of each plan and use their experience and subjective judgment, all based on actuarial criteria, in establishing this and all of the actuarial assumptions. The phrase "interest rate" assumption is more accurately described as an "investment rate" assumption as it *440 represents the expected aggregate earnings, gains, and losses on all investment vehicles held in trust for the plan during its existence. As a matter of convention, however, this aggregate return concept usually is referred to in the actuarial and pension community as an "interest rate" assumption, and we will refer to it here as such. In general, a defined benefit pension plan is established and maintained by an employer (plan sponsor) who systematically funds a pension plan trust from which a trustee (plan administrator) will make payments of definitely determinable benefits to participating employees (participants) over a period of years, usually for life. The definitely determinable benefits usually take the form of an annuity commencing at retirement and payable over the life of the participant or the joint lives of the participant and his or her spouse. For each participant, these definitely determinable benefits are measured by, and based on, factors such as years of service with the plan sponsor, compensation level, and other factors, all of which are incorporated into a benefit formula. The benefit formula determines what the plan's ultimate benefit *441 obligation will be. However, since many, if not all, benefit formula factors are unknown at the plan's inception, and some are unknown until benefit payout ceases under the plan, the amount of the benefit obligation is indeterminate and will be so until it is satisfied. Thus, the plan's ultimate benefit obligation is an estimate. The pension trust from which benefits will be paid accumulates assets from two sources: contributions from the plan sponsor during the preretirement period and earnings on the trust assets during both pre and postretirement periods. The interest rate assumption serves to predict the rate at which the trust will self-generate growth as opposed to increasing due to the sponsor's annual contributions. As noted above, earnings on the trust assets will accumulate tax free. Secs. 401(a), 501(a). The interest rate assumption is used by the actuary to predict the annual rate of return on assets in the trust over the life of the plan. This assumption is then used along with all of the other actuarial assumptions to calculate the required contributions. The actuarial assumptions do not affect the ultimate pension benefits paid under the plan or actual aggregate *442 cost of those benefits. Rather, the assumptions affect the pattern of asset buildup in the pension trust because they impact the timing and amount of the sponsor's contributions. Actuarial assumptions can be either conservative or optimistic. Conservative assumptions about future events affecting funding, such as lower estimated fund earnings and earlier retirement, tend to create higher required contributions. Optimistic assumptions tend to create lower required contributions. Sponsors of qualified defined benefit pension plans must make timely contributions sufficient to assure that the plans' estimated benefit obligations are satisfied ultimately in accordance with the plans. Sec. 412. The size of the annual contribution will vary under a defined benefit plan, depending on the actuarial cost method chosen and the actuarial assumptions made, but is always actuarially calculated with the objective of having the pension trust attain a funding level sufficient to satisfy the pension obligations as they come due. The enrolled actuary also attempts to choose an actuarial method and assumptions that will provide for a smooth funding pattern over the life of a plan. The actuarial *443 cost method used by Wolper Ross with respect to Wachtell Lipton's IDB plans is not at issue in this case. The actuary's primary duty to plan participants under the statutory scheme established by Congress is to establish a realistic contribution pattern over the long term so that the plan sponsor will provide adequate funding for the ultimate pension obligation. Thus, in selecting actuarial assumptions, prudent actuaries maintain a long-term conservative view that will ensure benefit security for plan participants. All of the actuaries who testified at trial confirmed this basic characteristic of actuarial science. Once a plan has established "credible experience", selecting actuarial assumptions becomes a less worrisome task in this regard; the actuary can take comfort that this actual experience has established a reliable trend, and such experience is then useful in predicting future plan experience. All of the actuarial experts generally agreed that a plan should sustain at least 3 years, and as much as 5 years, of plan experience before such experience can be considered "credible experience" for purposes of significantly impacting the establishment of actuarial assumptions *444 for the plan. See Rev. Rul. 63-11, 1963-1 C.B. 94, 96 (reasonableness of the originally established actuarial assumptions should be reassessed after a plan has been in effect for a period of about 5 years). Cf. Jerome Mirza & Associates, Ltd. v. United States, 692 F. Supp. 918 (C.D. Ill. 1988), affd. 882 F.2d 229 (7th Cir. 1989) (reasonableness of actuarial assumptions reviewed where 73 percent of pension benefit obligation was funded in the first year of plan). Conversely, where the plan is new or lacks such credible experience, the actuary must be cautious in selecting actuarial assumptions that reflect only recent economic or plan experience. Also, general or even specific participant statements of intended investment strategy or even an expressed intention to obtain a specific investment does not provide a reliable basis on which an actuary can base the choice of interest rate assumption. Such intentions often fail to be carried out, and the choice of investment vehicles as well as economic conditions can vary widely in the short run. Experience under the plan should be sustained before it becomes a primary *445 basis for selecting assumptions. This fact is recognized by the Interim Actuarial Standards Board of the American Academy of Actuaries, which recommends as follows: The actuarial assumptions in combination should reflect the actuary's best judgment of future events affecting the related pension obligations. The actuary should consider the actual experience of the covered group but should emphasize expected long-term future trends rather than give undue weight to recent past experience. * * * [Actuarial Standard of Practice No. 4, Recommendations for Measuring Pension Obligations, sec. 7.1 (Interim Actuarial Standards Board 1990 reprint).] In addition, selecting actuarial assumptions that are too optimistic in a new or relatively young plan adversely affects the ability of the plan to "self-correct" without significantly increasing the required contributions. A plan will actuarially self-correct in a mathematical sense through the annual actuarial contribution calculation: the contribution in a subsequent plan year will be higher or lower than originally anticipated for that year to correct for prior years' actual experience under the plan. When the assumptions are too optimistic, *446 future contributions will have to be higher than originally planned. This disrupts not only the desirable smooth funding pattern, but burdens the plan sponsor to provide higher than anticipated contributions. If the assumptions are too conservative, then the plan sponsor will decrease contributions accordingly -- an easier task than finding resources that were not budgeted. Use of overly optimistic assumptions therefore increases the chances that the sponsor may ultimately fail to fully fund the plan. It is common knowledge that many pension funds have fallen prey to just such a fate with the Pension Benefit Guarantee Corp. having to cover the resulting losses. [8]
*447 Moreover, if the assumptions remain consistently too optimistic, even for a relatively brief number of years, asset accumulation suffers further because investment income fails to accrue on contributions that, in hindsight, should have been made earlier. This loss of compounded earnings can be a significant factor, especially in tax-exempt trusts. In addition, the impact of and the risk associated with failing to earn the anticipated rate of return is magnified in small plans where actuarial losses cannot be spread among many participants. The Interim Actuarial Standards Board of the American Academy of Actuaries recognizes this fact in guiding actuaries in establishing assumptions for small plans: In a plan where much of the obligation is associated with a small number of participants, special attention should be paid to potential fluctuations and the aggregate effect of the assumptions. * * * [Actuarial Standard of Practice No. 4, Recommendations for Measuring Pension Obligations, sec. 7.3 (Interim Actuarial Standards Board 1990 reprint).] If actual experience for an assumption, or assumptions, varies significantly from the predicted results so that a consistent pattern *448 of gains or losses emerges, the enrolled actuary will adjust the actuarial assumptions accordingly. [9] Also, any actuarial gains are amortized over time with a corresponding reduction in contributions. Sec. 412(b)(3)(B)(ii). Addressing the actuarial experts who testified at trial, we first note that they were well qualified and helpful to the Court. As we discuss below, their individual actuarial experience, which influences an actuary's professional judgment, differed. We note that while different actuaries will use different starting points and each will have his or her own experiences from which to draw, there are several commonalities from which all actuaries apparently draw and consider in establishing an interest rate assumption: (1) Long-term historical economic trends and investment rates of return; (2) the economic components *449 inherent in interest rates; (3) the current rates on long-term investments; and (4) actuarial and plan specific factors for which benchmark rates or ranges of rates are adjusted. In addition, all of the actuarial experts recognized that there will be a range of reasonable rates for any given set of circumstances under which actuarial assumptions are established. Petitioner's Actuarial Experts
Wachtell Lipton's expert Riebold testified about the reasonableness of the 5-percent interest rate assumption and stated that four factors should guide actuarial interest rate assumptions. Initially, she affirmed that there is no single correct assumption; a range of reasonable assumptions should be established. Riebold also concluded that small self-directed investment plans, such as IDB plans, will have lower rates of return than large plans or published indices. Reasons for this include inability to make use of economies of scale, often volatile and ill-timed personal investment decisions by the plan participant, and the possible increased need for liquidity in a personal plan. In addition, she noted the eighties have been an atypical investment cycle and, like any brief segment *450 of past plan experience -- especially the first years of plan experience -- cannot be considered to be determinative of future experience. Finally, with respect to the long-term nature of the interest rate assumption, Riebold explained that predictions are bound to be imprecise. Riebold also concluded that the "select and ultimate" approach (where different rates are selected for succeeding periods) would be too costly for a small plan to employ. She also discounted the notion that if, for example, a 20-year bond were available today earning 8 percent, and the preretirement period was also 20 years, 8 percent would be a good predictor of the rate of return. Such analysis assumes that no future contributions would be made, no bonds would mature or be called during the 20 years, and benefit payments matched investment income exactly. Riebold stated that long-term bond rates cannot be direct predictors of future rates given the realities that: (1) Future contributions will be made to the plan at varied interest rates; (2) bonds eventually mature; (3) bonds may be called early; and (4) benefit payments may not match interest income. Using the facts available in 1986, Riebold constructed *451 a model by which a range of interest rate assumptions might be derived. Her model showed an acceptable interest rate assumption for 1986 of between 5.03 percent and 6.59 percent, based on aggregate economic information including interest rate projections made in 1986 by the Council of Economic Advisors (CEA). In arriving at this range, Riebold projected a 20-year funding period (e.g., a 35-year old participant retiring at age 55), and a 10-year maturity on all investments instruments purchased, and assumed reinvesting all interest payments. The CEA in 1986 projected an interest rate on 10-year Treasury notes declining from 7.5 percent in 1987 to 4.5 percent in 1991. In addition to economic analysis, Riebold, also utilized what she referred to as the "more intuitive form of analysis" of Ira Cohen (Cohen), who in 1986, as the then-director of the Actuarial and Technical Division of the Service, stated to a meeting of enrolled actuaries that a 4-percentage point corridor on either side of the prevailing long-term Treasury bond rate was within the reasonable range of interest rate assumptions. In 1986, the rate for long-term Treasury bonds was 7.5 percent; thus, Cohen gave his imprimatur *452 to an interest rate assumption potentially as low as 3.5 percent, much more conservative than the 5 percent in question. Riebold testified that while Cohen's statement was not determinative, it was an additional consideration an actuary would have considered in 1986 in establishing an actuarial interest rate assumption. Riebold stated that all of the same factors should guide an actuary in his or her consideration of postretirement interest rate assumptions as guided him or her in making preretirement assumptions. She added that although it is common practice to use the same rate for both the pre and postretirement periods, postretirement assumptions are even more uncertain than preretirement assumptions, given the longer period for prediction (participant's and spouse's joint life expectancy), warranting yet further conservatism. In addition, since current bond rates are not determinative of bond rates 20 years in the future, Riebold concluded that the CEA estimate of a post-1991 bond rate of 4.5 percent was a useful predictor here, further indicating that a 5-percent interest rate assumption was "eminently reasonable". Wachtell Lipton's expert Joss approached the interest rate *453 assumption question in two parts, first determining an acceptable range of rates, and then determining what a "best estimate" would be within that acceptable range. Joss concluded, like Riebold, that 5 percent was reasonable. Joss used four widely accepted methods of calculating assumed interest rates, using the high and low from each to establish an acceptable range. He examined historical trends for the last 20, 30, and 40 years for four different types of investments (common stocks, corporate debt, and short- and long-term Government debt), finding the highest rate of return, 11.8 percent, to be for common stocks bought between 1947 and 1987, and the lowest rate of return, 4.2 percent, to be for long-term Government bonds bought between 1946 and 1986. Thus, he established a range of acceptable rate assumptions of between 4.2 percent and 11.8 percent. The three components of the interest rate are: (1) The risk-free real rate of return; (2) an inflation factor; and (3) a risk premium for lower grade or illiquid investments. Joss examined these three components over 60-, 40-, and 20-year periods, and arrived at a risk-free rate of return averaging about 0.6 percent, an inflation *454 rate averaging about 3 percent (taking into account the fact that in 1986 inflation was widely expected to continue its downward trend), and a risk premium ranging from 0.7 percent for corporate bonds to 5 percent for equities. By aggregating all of these figures, Joss arrived at an acceptable range of interest assumptions extending from a relatively risk-free 3.6 percent to a much higher-risk 10 percent. In addition, Joss examined the then-current (1986 and 1987) yields on 20- and 30-year Treasury obligations, finding both types of instruments to be yielding between 7 percent and 9 percent. He added, however, that current yields on Treasury bonds are rarely indicative of longer-term interest rates, noting that there is very little short-term variation but significant longer-term volatility. For example, he stated that Treasury bond rates in 1979 were 5 percentage points higher than they were in 1986, only 7 years later. Last, Joss examined outside economic data, in this case data provided by the Office of Management and Budget, which forecast that the 1986 8.9-percent yield on 10-year Treasury notes would fall to 4.5 percent by 1991. Thus, an actuary would be justified in assuming *455 an interest rate between 4.5 percent and 8.9 percent. Based on the above analysis, Joss concluded that an interest rate assumption between 3.6 percent and 11.8 percent would have been reasonable. After determining that range, Joss narrowed it by enumerating several factors that an actuary might use to determine a single interest rate assumption. First, an actuary should take into account the standards of the actuarial community. Joss stated that a 5-percent interest assumption was in 1986 "within the actuarial mainstream." [10] Second, the asset base of a new plan is much less stable than that of a well-established plan (i.e., one with substantial funding); thus, a more conservative interest assumption is warranted. Third, plans with a smaller asset base and number of participants, such as IDB plans, will earn substantially less, generally 2.5 percent to 3 percent less, than large plans that can take advantage of economies of scale and professional management. [11] Fourth, long-term interest rates cannot be extrapolated with impunity from current rates. Fifth, a lower interest rate assumption with a higher actual rate of return scenario is preferable to a high assumption and low *456 return scenario in that the latter situation leads to severe instability regarding plan funding needs. Respondent's *457 Actuarial Experts
Respondent's expert Poulin testified that a 5-percent interest rate assumption was too conservative. Poulin, who conceded that 2 years of investment experience carries little weight in predicting future investment experience, stated that interest rates generally are composed of three separate components: (1) The "pure" rate of interest in an inflation-free environment, which he posited was about 4 percent; (2) the level of anticipated inflation, which he stated has averaged 5.86 percent annually, as measured by the consumer price index over the last 25 years; and (3) a risk premium to compensate investors for the potential loss of capital, which Poulin calculated to be between 1 percent and 2 percent. After having devised this formula for determining interest rates, Poulin stated that, in practice, the easiest means of arriving at an interest rate assumption is to determine the yield of a specific type of investment which: (1) Bears no risk of loss of capital or fluctuation of income; (2) is available at any point in time with varying maturity dates; and (3) can be purchased at low cost. Poulin concluded that such an investment instrument exists -- a Treasury *458 obligation. Given that a defined benefit pension plan is "at least in theory, a long-term undertaking", said Poulin, the 30-year Treasury bond rate would be an appropriate benchmark riskless interest rate. Poulin then stated that with Forms 5500 prepared at the end of 1987 and signed by the enrolled actuary on January 1988, the appropriate interest rate would be that which was prevailing for 30-year Treasury bonds at that point in time, approximately 9 percent. He added, however, that 1 percentage point might be deducted to take into account the possibility of lower interest rates and another percentage point deducted for unforeseen contingencies such as the "unexpected market reaction" of October 19, 1987. After stating that the interest rate on the 30-year Treasury bond provides a suitable benchmark, Poulin described an "objective standard" for determining reasonable minimum interest rate assumptions for pension plans as developed in a proposal by the Pension Section Council of the Society of Actuaries (the Society). This objective standard has four steps (only three steps as articulated by Poulin), which are as follows: (1) A current riskless rate (CRR) is defined as the annual *459 yield on 30-year Treasury bonds "at the time contribution limits are determined"; (2) an ultimate riskless rate (URR), an estimate of where the riskless rate may tend over time, is defined, as suggested by the Society, at 5 percent; (3) assets on hand are assumed to earn the CRR, and assets not yet available are assumed to earn the average of the CRR and URR; and (4) the figure derived in calculation (3) is multiplied by 80 percent to derive the minimum reasonable interest assumption, which, according to Poulin, "assures that the minimum reasonable interest rate will be very conservative." Applying this test to plans funded between 30 percent and 50 percent, and using a 9-percent 30-year Treasury bond rate (the approximate yield as of January 1, 1988), Poulin estimated the minimum reasonable interest assumption to be between 6.1 percent and 6.4 percent, and the maximum reasonable interest assumption to be between 9.1 percent and 9.6 percent. Respondent's expert Haneberg began his analysis with an identification of the three types of assets in which pensions funds are generally invested: Corporate equities, fixed income securities (both corporate and Government), and cash equivalents. *460 Within each of these three categories of assets, Haneberg determined the long-term (20 year), intermediate (10 year), and current (1 year) average yields of "passive" or low-maintenance investments (low-maintenance), as well as the average yields for "managed" or high-maintenance investments (high-maintenance) during the same periods. He made his calculations based on information available in 1984, the year that many of Wachtell Lipton's plans were established. Using the Standard & Poor's 500 Stock Composite Index as a measure of the broad market of equities in the United States, Haneberg calculated that long-term, net low-maintenance and net high-maintenance rates of return for equities were 7.69 percent and 7.97 percent, respectively. Intermediate low-maintenance and high-maintenance returns were determined to be 10 percent and 10.28 percent, respectively. Current yields for equities were considered actuarially irrelevant by Haneberg, given the volatility and short-term fluctuations of equity markets. Haneberg based his low-maintenance fixed income assumption on 20- and 30-year maturity U.S. Treasury bonds, finding long-term, intermediate, and current net low-maintenance yields *461 of 7.74 percent, 9.96 percent, and 11.39 percent, respectively. To calculate a net high-maintenance yield, Haneberg included yields from high-grade corporate and Government agency bonds. Haneberg stated that a high-maintenance bond portfolio should perform 1.25 percent better than one consisting of low-maintenance Treasury obligations and, after subtracting a management fee, found long-term, intermediate, and current managed yields of 8.34 percent, 10.56 percent, and 11.99 percent, respectively. Low-maintenance cash equivalents, according to Haneberg, are 3-month Treasury bills, the average annual long-term, intermediate, and current yield of which was calculated by him to be 7 percent, 8.97 percent, and 8.92 percent, respectively. Haneberg used the return on money market funds as a proxy for the return on high-maintenance cash equivalents, which would include commercial paper, other short-term non-Government debt, and certificates of deposit. While a long-term figure was not available, intermediate and current yields for these instruments were calculated by Haneberg to be 9.6 percent and 8.78 percent, respectively. Using the above figures, Haneberg concluded that in 1984, the *462 year of Wachtell Lipton's plans' inception, a conservative actuary might have legitimately assumed a 7.5-percent interest rate, and a more optimistic actuary might have reasonably assumed a 10.5-percent interest rate. An interest rate assumption of 5 percent, as was made by Wolper Ross, would, in Haneberg's opinion, "require significant further justification." The interest rate assumptions in question, however, were made for the 1986 plan year. While Haneberg recognized that actuaries generally do not alter their interest rate assumptions, he stated that, on the basis of several post-1984 contingencies, [12] he would have broadened his acceptable range of interest rate assumptions to include any figure between 7 percent and 11 percent. *463 Discussion
Although the actuarial experts differed in their ultimate conclusions about the reasonableness of the 5-percent interest rate assumption in question here, they all agreed on several basic tenets regarding actuarial assumptions. They agreed, inter alia, that a reasonable range exists for each set of circumstances, that actuarial interest rate assumptions are long-range predictions that become increasingly speculative with the length of the prediction, and that an element of conservatism is appropriate in the selection of actuarial assumptions. They also recognized that the existing experience of new, immature plans without "credible experience" should not guide the actuary in the selection of assumptions, and that the actuary's choice of assumptions is guided by his or her professional experience as well as actuarial analysis. They all employed an analytical approach that involved selecting a suitable starting point derived either from historical economic data or a current economic benchmark, and then adjusting it for various established actuarial factors as well as for those plan specific factors that, in that actuary's judgment, produced the appropriate actuarial *464 reasonable range. Respondent's two actuarial experts, Poulin and Haneberg, concluded that reasonable ranges for Wachtell Lipton's plans during the year at issue were 7 percent to 11 percent. Wachtell Lipton's two actuarial experts concluded 5 percent was reasonable. Riebold reached a conclusion of "reasonable" for the 5-percent assumption. Joss opined on reasonable ranges of 3.6 percent to 11.4 percent for plan year 1986. Riebold and Poulin arrived at their reasonable ranges by choosing a benchmark rate current or proximate to the period at issue, and then making adjustments. Joss and Haneberg arrived at their reasonable ranges based on an analysis of historical rates of return on the various types of securities in which the plans might invest. Beginning with their differing conclusions drawn from this extrinsic economic data as a starting point, both actuaries then made adjustments for actuarial considerations. In our view, both Riebold's and Joss' analyses present an appropriate approach to the task of selecting an actuarial interest rate assumption, and we accept their conclusions. Similarly, we find Poulin's and Haneberg's expert reports present valid approaches to selecting *465 an actuarial interest rate assumption. However, we cannot accept their conclusions because they omit several important considerations. Poulin arrived at a reasonable range of 7 percent to 11 percent. The lower endpoint was calculated with a beginning point of approximately 9 percent, which was the rate paid by 30-year Treasury bond yield in January 1988, less a 2-percent adjustment. However, the January 1, 1988, date used by Poulin to set the benchmark rate is not appropriate. In choosing a benchmark rate for his analysis of a plan year beginning July 1, 1986, Poulin selected the latest period that the actuary could have prepared and signed the actuarial report required by section 6059. We consider a more logical date for such a plan year to be the valuation date, in this case, July 1, 1986, when the 30-year Treasury bond benchmark rate would have been approximately 7.2 percent. The plan's valuation date is that date at which the actuary determines the plan's then-projected benefit obligation and the plan's assets to meet such obligation. This is the mathematical starting point from which that year's contribution will be added. However, since the contribution can be calculated *466 only after the actuarial assumptions for that year are selected, it would be unreasonable to wait 19 months before establishing the assumptions. This is especially true in the case of a cash basis plan sponsor who, like Wachtell Lipton in this case, must make the contribution within its taxable year to be entitled to flow the deduction through to its partners. Making the downward 2-percent adjustment determined by Poulin from the more appropriate benchmark rate of 7.2 percent produces a 5.2-percent reasonable range lower endpoint. In addition, Poulin's analysis reaching a 2-percent reduction due to actuarial concerns in the benchmark rate was applicable to large plans. Had Poulin accounted for the plans' small size, the additional reduction would have further lowered the endpoint. We also note that Poulin's interest rate assumptions in his own significant experience with small plans are more consistent with Wachtell Lipton's experts' conclusions than his own in this case. He previously had used an interest rate assumption of 5.5 percent for many small plans during the same period at issue here, including his own. Haneberg's historical analysis used only the most recent 20 years *467 of the available data, while Joss' analysis used 40 years. Given the fact that most of Wachtell Lipton's plans were to be funded (both pre and postretirement earnings) over a 30- to 50-year period, the longer-term data are more reflective of the likely long-term rates of return. Haneberg also failed to use "total returns" and instead used "yields" in computing his forecasts. Yields are a measure of annual rate of interest or dividend return on a given investment, while total returns measure the return provided by the yield in addition to gains or losses incurred on the disposition of the asset. As previously discussed, it is likely that self-directed plans may experience ill-timed changes in investment strategy; thus, total return rates tend to be lower than yield rates over time. When Haneberg's methodology was adjusted for these two factors and the ranges recalculated in an identical fashion by Wachtell Lipton's financial expert, Peavy, the resulting range of expected returns was 3.6 percent to 9.78 percent. The amended Haneberg range is consistent with Joss' range of 3.6 percent to 11.4 percent for 1986. Moreover, Haneberg's primary experience was with large multiemployer *468 plans. He had little experience with small plans and no experience with IDB plans. He failed to make any adjustment for the small size of Wachtell Lipton's plans despite acknowledging that many small plans would end up with lower interest rate assumptions because of their investment policies. The interest rate assumption is a long-term estimate that must accommodate diverse and erratic market conditions. Since the actuary's paramount duty is to create a realistic pattern of contributions over the life of the plan which ensures that the plan sponsor will be able to provide adequate funding of the ultimate pension obligation, funding assumptions must have viability in the long term. Against this background, we find the following factors discussed above particularly important in determining the reasonableness of the 5-percent actuarial interest rate assumption concluded by Wachtell Lipton's experts: (1) The nature of the responsibility Congress entrusted to enrolled actuaries in the statutory scheme enacted for defined benefit pension plans; (2) the conservative nature of the actuarial assumption selection process; (3) the fact that Wachtell Lipton's IDB plans were long term in *469 nature with funding to occur over a 30- to 50-year period; (4) the fact that Wachtell Lipton's plans were self-directed with each participant being a coadministrator, especially since most of the IDB plans did not employ a professional manager; (5) the fact that Wachtell Lipton's plans lacked "credible experience" with respect to earnings, investment strategies, and otherwise; (6) the risk of losing compounded earnings in a tax-exempt trust associated with using overly optimistic assumptions, and the resulting requirement for unanticipated higher contributions in later years; (7) the relative closeness of all the actuarial experts' reasonable ranges; and (8) the fact that most actuaries used interest rate assumptions of between 5 percent and 6 percent for small plans during the years at issue. The combination of these factors weighs heavily in favor of concluding that 5 percent was reasonable. Respondent also proffered the testimony of two nonactuaries (Shapiro testified at trial and submitted a report, while Jaffe only submitted a report) regarding the financial and equity markets in which investments are likely to be made. We received this evidence with the caveat that these persons *470 were not actuaries and, as such, conclusions they drew would have limited application in the determination of the reasonableness of actuarial assumptions. Shapiro and Jaffe, neither of whom had established actuarial assumptions or studied actuarial science or its underlying principles, discussed rates of return they expected the market to bear in the future. Both financial experts concluded that a 5-percent return was an unreasonably low forecast of expected earnings for assets invested during the period at issue. Both of these financial experts used probabilistic economic forecasting techniques that are different from and contrary to actuarial principles in several material respects. For example, Shapiro stated that past investment data cannot be used as a factor to predict future returns, whereas section 412(c)(3) specifically requires the enrolled actuary to take into account the plan's past experience. Sound actuarial principles require that once a plan accumulates "credible experience", the actuary should consider such experience. Shapiro also testified that small plans should be able to achieve the same rates of return earned by large plans, while most actuaries during *471 the period at issue predicted a significantly lower rate of return for small plans. Moreover, all the actuarial experts in these cases agreed that small plans tend to underperform large plans. In addition, Shapiro's methodology was based on "yields" rather than "total returns". As discussed above, this is an unrealistic assumption that inflates the expected rate of return. For example, if an equity or debt instrument returns 10 percent per year on average over the stated period, it does not follow that an actuary should choose 10 percent for the same period as the appropriate actuarial interest rate assumption. In practice, investors self-directing their own plans frequently change investment strategies. Given the fluctuating nature of markets, many of these investors are likely to be buying and selling at the wrong time. Thus, the total return for those investors may be substantially less than that predicted for the broader market, regardless of how well that market performs. A principal distinction between the viewpoint of a financial analyst projecting future investment returns and an enrolled actuary establishing an interest rate actuarial assumption is that the latter *472 projection is made with the objective of assuring that the plan has adequate assets to meet the pension benefit obligations as they come due. If a financial analyst's predicted rate of return is higher than the actual rate earned, the investor simply earns less than he supposed he would earn. If an actuary makes the same mistake, there is a significant risk that the plan will become underfunded and the pensioners' full benefits will be unpaid. With all due respect to the financial analysts whose testimony we received, while we have considered the information they presented regarding financial and equity markets, we cannot accept their conclusions. The analysis propounded fails to account for concerns an actuary for a self-directed IDB plan must take into account. Congress did not entrust the Nation's tax-advantaged retirement savings system to hypothetical returns that the markets "should" bear. That task was left to actuaries whose background, training, orientation, and philosophy is well suited to the task. As practitioners specifically enrolled under the scheme established by Congress to create a smooth funding pattern assuring that benefit obligations will be met, they *473 necessarily have a different perspective. The selection of an interest rate assumption is an actuarial judgment made in accordance with actuarial principles materially different from financial market performance forecasting. Respondent also argued that selection in 1984 of a "uniform 5% investment return assumption for each of the 41 plans without asking any of the * * * [Wachtell Lipton] partners about the type of investments they planned to make, their investment philosophies regarding plan assets or their prior investment experience" is unreasonable. To the extent that Segal chose a single rate and did not rely on or even investigate the partners' individual investment philosophy or prior investment experience unrelated to the IDB plan, we find Segal's actions reasonable. As all the actuarial experts agreed, until a plan develops sufficient "credible experience" regarding investment strategy and rates of return, such information carries little or no weight in establishing actuarial assumptions. In sum, after considering all of the evidence presented, we conclude that the 5-percent pre and postretirement interest rate actuarial assumption used to calculate the contributions *474 for Wachtell Lipton's plans was reasonable for the year at issue. Retirement Age
Segal established an actuarial assumption of age 55 for the retirement age of the Wachtell Lipton partners adopting an IDB plan. Each IDB plan provided for a "normal retirement age" of 55 and 15 years of service. For those partners who were older than age 50 at the inception of the IDB plans, the normal retirement age was the later of 15 years of service or the fifth anniversary of the date the partner began participating in the IDB plan, but no later than age 65. A partner could begin receiving full benefits under the IDB plans upon termination of active service with Wachtell Lipton at the "normal retirement date". This date was defined in the IDB plans as the first day of the month coinciding with or next following the date the participant reached normal retirement age. Prior to the adoption of the IDB plans, Wachtell Lipton had established Keogh plans for its partners. These were defined contribution plans for self-employed individuals that permitted a modest annual tax-free contribution. These plans were frozen when the IDB plans at issue were adopted in 1984. The firm had also, from *475 time to time, considered adopting unfunded retirement plans for its partners and had considered the incorporation of individual partners to permit corporate style, tax-deferred retirement savings, but never took such action. Einhorn, a partner at Wachtell Lipton and the firm's TMP for 1986, was involved in the design, adoption, and maintenance of the IDB plans. He was one of three Wachtell Lipton partners who met with representatives from Wolper Ross, beginning in 1983, and communicated the firm's objectives and goals in establishing IDB plans. He expressed to Wolper Ross representatives that the firm wished to benefit from a recent change in the law which permitted self-employed individuals to establish IDB plans. The firm wished to adopt plans that would enable each partner to set his own retirement objectives and to obtain the maximum tax benefits permitted by law. Einhorn testified that he adopted age 55 as the normal retirement age in the IDB plans after consultation with his partners that such retirement age was appropriate for the firm. Leonard Rosen (Rosen), a founding partner of Wachtell Lipton, testified about the history of and climate within Wachtell Lipton. He explained *476 that the management style that existed when the firm was formed in 1965, and that continued through the mideighties, was quite informal. The five founding partners agreed not to create a partnership agreement. Their philosophy regarding the practice of law and the creation of the new firm was to require total commitment to the firm; to establish an equal profit-sharing system among themselves to foster close working relationships and eliminate internal competition; to hire only those lawyers who would one day become partners of the firm; to obtain only complex and challenging legal work from "significant" clients; to adopt a teamwork approach in resolving those clients' needs; and to institute a retirement policy that was simply a promise to take care of the families of any of the founding partners who died or became disabled. Rosen testified that as a result of this philosophy, Wachtell Lipton grew and prospered. Its practice today primarily involves representation of corporate clients in takeovers, mergers, and acquisitions; business and securities litigation; and creditors' rights and bankruptcy. Its clients include Fortune 500 corporations and investment banking firms. Its *477 lawyers earn significant amounts of money. Its associate-to-partner ratio is generally 1:1, and the period in which an associate can expect to become a partner is approximately six years, less than that of many major law firms. However, this success has not been without some drawbacks and sacrifices. During the mideighties, the height of the corporate takeover period, Wachtell Lipton operated 24 hours a day, 7 days a week. There was tremendous competition among major law firms for takeover work as it was extremely profitable. Often this work was viewed as necessary to resolve crisis situations and deadlines usually were imminent. Partners and associates in the corporate and litigation departments at Wachtell Lipton were required to be available day and night to come to work at "a moment's notice". During this time, the lawyers were under tremendous stress as a result of the constant unpredictability of their lives and the inability to plan events and spend time with their families. Rosen testified that the stress and constant pressure to perform impacted negatively on the lawyers' well-being and on their personal relationships with others. He attributed the unusually high *478 number of divorces within the firm and the departures from the firm, in part, on this sustained pressure. It was against this background that Rosen explained the retirement policy of Wachtell Lipton during the mideighties. Historically, the firm had not seriously considered the concept of retirement or "phase-down". "We've really viewed ourselves as being full time warriors, and we have not thought seriously about the problem of the wind-down." Rosen testified that the three founding partners who remained with the firm were the oldest partners and closest to retirement. They had "this understanding with each other that we're going to take care of each other, and also because the younger partners feel generous with respect to us, I think, that they will take care of us whenever we leave." The issue of retirement was never "a front burner issue with us." The report of Wachtell Lipton's expert, Rabenhorst, demonstrated a clear trend toward earlier retirement in the general population. Rabenhorst cited Employee Benefit Research Institute briefs from August 1986 and June 1990 and a General Accounting Office (GAO) report from 1985 which confirm this trend. In particular, he noted *479 that the GAO report provided "substantial evidence to indicate that age 62 has replaced age 65 as the retirement age chosen by most private sector workers." Rabenhorst explained that one of the most significant factors influencing the move toward earlier retirement is the ability to establish pension plans that will provide adequate income for retirement. He also cited the growing social acceptance of earlier retirement as a factor influencing the choice to retire at an earlier age. Rabenhorst concluded, based on his extensive experience dealing with large law firms, that the trend toward earlier retirement in the general population was evident also among large law firms. He further explained that certain characteristics of Wachtell Lipton supported even earlier retirement expectations. Rabenhorst noted that in 1985, for example, Wachtell Lipton was involved in 34 of the top 100 major corporate transactions. These matters often involved defending corporate clients against unwanted takeover initiatives. As such, they required decisive action in short periods of time, and because these matters seldom occurred sequentially, they led to "extraordinary and unpredictable professional *480 demands." The relatively small size of the firm and its low ratio of associates to partners required the partners at Wachtell Lipton to work hard. Rabenhorst further noted that because of Wachtell Lipton's size and low associate-to-partner ratio, the "partners are expected by the Firm to continue to work at their full capacities at all stages of their careers. Retirement or other departure is the only means for a partner to enjoy a more leisurely way of life." Rabenhorst reviewed income data for the partners at Wachtell Lipton for the years 1985 through 1990 and determined that for those years their incomes were significantly high. This can be attributed, in part, to the fact that a high percentage of the firm's fees are billed based on the value of the transaction rather than the number of hours devoted to the project. In any event, Rabenhorst concluded that the partners at Wachtell Lipton were able to accumulate significant wealth to afford retirement or departure from the firm at an earlier age. Finally, Rabenhorst explained that in 1986, Wachtell Lipton was a relatively young firm with no significant amount of retirement experience. In 1986, only one partner was older than *481 age 55. Rabenhorst also noted that Wachtell Lipton had no written partnership agreement, no mandatory retirement age, and imposed no constraints on retirement by partners. Under the terms of the IDB plans, a partner was entitled to unreduced benefits upon termination of service with the firm at the normal retirement age; those benefits were not subject to forfeiture for any reason. Termination of service with the firm meant that a partner could leave the firm to pursue a career at another firm or cease to work altogether. Given this flexibility to make their own decisions regarding retirement, Rabenhorst concluded that Wachtell Lipton partners would be likely to leave the firm at an early age. According to Rabenhorst, given the trend among law firms toward earlier retirement ages and given the characteristics of Wachtell Lipton, it was reasonable for an actuary to assume in 1986 that Wachtell Lipton partners would retire or otherwise depart from the firm by age 55. Riebold noted in her report that at the time the plans were formed, no partner had ever remained at Wachtell Lipton past the age of 55 and as of July 1, 1986, only one of the partners was over 55 years of age. In *482 addition, she determined that the cash flow of the partners at Wachtell Lipton was considerable and allowed them to set aside substantial assets at an early age, enabling them to retire at age 55. Riebold relied on Rabenhorst's report to confirm a general trend toward early retirement and concluded that, "for the reasons described in Mr. Rabenhorst's supplemental report", age 55 was a reasonable retirement age assumption for Wachtell Lipton partners. Respondent determined that the retirement age assumption of age 55 for plan year 1986 was unreasonably low and was not the plans' actuary's best estimate of anticipated experience under the plans. Respondent argued that a retirement age assumption ranging between ages 62 and 66 was reasonable for the Wachtell Lipton partners. Respondent contended that since Wachtell Lipton had no official or unofficial retirement policy for the partners during 1986, the actuary should have reviewed "facts and information from which the retirement policies may be gleaned or implied" to reach a reasonable assumption about retirement age. Respondent reviewed memoranda between Wachtell Lipton's retirement committee, which had been established to consider *483 an unfunded retirement plan for the firm's partners, and Wolper Ross. Many of the memoranda anticipated or considered various retirement ages, all ranging from age 60 to age 68. In some of the memoranda, the retirement committee requested that Wolper Ross compute the costs of payouts to partners under various scenarios using retirement ages of 60 and 65. Respondent contended that these memoranda expressed Wachtell Lipton's retirement expectations and, thus, reliably illustrated a retirement age for the partners. Respondent also reviewed beneficiary designation forms that were provided to IDB plan participants. These forms allowed the participants to indicate, among other things, the date on which their retirement benefits would commence. The choices available were: The normal retirement date (age 55); termination of service with Wachtell Lipton, but after the normal retirement age; and a specified date after the normal retirement age. Of the 32 forms reviewed by respondent, 25 illustrated that the participant selected a date which was upon termination of service with Wachtell Lipton, but after the normal retirement age. Respondent believed that this indication by a majority *484 of plan participants, that they wished their benefits to commence on a date after the normal retirement age specified in the plan, was a good indication of the participants' retirement expectations and, thus, should have been accorded great weight by the plans' actuary. Respondent argued that another factor to be considered by an actuary in making a reasonable assumption about retirement age is the level of pre and postretirement income of a plan participant. The Wachtell Lipton partners received annual partnership income of over $ 1 million for the year at issue; the maximum benefit that they would receive under the IDB plans was $ 75,000. Respondent contended that this level of retirement benefits could hardly induce a partner to earlier retirement. Respondent noted Rosen's testimony that he was financially unable to retire in 1986, despite having earned over $ 1 million annually for each of the previous 10 years, as support for this argument. Respondent also considered the current ages of the Wachtell Lipton partners as evidence that a retirement age assumption of age 55 was unreasonable. At the time of trial, four Wachtell Lipton partners were over the age of 55. Finally, *485 respondent's expert Poulin acknowledged that although there was some indication of a trend toward earlier retirement, that trend was reversing because full Social Security benefits were being made available at later ages. He noted that, in some professions, a retirement age of 55 or earlier would be reasonable, but he maintained that those professions are ones in which intense physical demand, stress, and repetitive working conditions are the norm. Poulin cited a 1988 study published in The Review of Economics and Statistics which concluded that "physical and emotional strain" are connected to earlier retirement and "interaction with people and intellectual effort" are associated with later retirement. Moreover, Poulin asserted that the age chosen for the Wachtell Lipton plans was inconsistent with the results of a study done by Wolper Ross in 1990. That study showed a median retirement age of 65 between 1980 and 1985 and a median retirement age of 61 between 1986 and 1990. Poulin also disagreed with Rabenhorst's determination that Wachtell Lipton's practice made a 55 retirement age reasonable; he found that there was no indication that Wachtell Lipton partners were under greater *486 stress than others similarly situated. He noted that, at the time of trial, the four senior partners had not retired even though they ranged in age from 55 to 59. Poulin concluded that a reasonable retirement age assumption would be no earlier than age 62. Upon review of all the evidence, we find that in 1986, it was reasonable for an actuary to assume that Wachtell Lipton partners would retire or otherwise depart from the firm by age 55. We will now address each of respondent's concerns. Memoranda related to Wachtell Lipton's consideration of unfunded retirement plans for its partners did not provide credible, reliable information concerning the firm's retirement policy. The evidence showed that such plans were never adopted and the memoranda reviewed by respondent represented, at most, the firm's preliminary deliberations on the subject. The beneficiary designation forms filled out by the IDB plan participants might have required consideration by an actuary making funding assumptions; however, they are not determinative of a Wachtell Lipton retirement policy. Of the three options provided by those forms, only one allowed the participant some flexibility in choosing a date *487 for commencement of retirement benefits. As that option was the one which specified retirement benefits would commence upon termination of service with Wachtell Lipton but after the normal retirement age, we are unable to conclude, as did respondent, that it is indicative of when a participant would actually wish to commence retirement benefits. Accordingly, those materials do not support respondent's determination that a retirement age assumption of 55 was unreasonable. We find questionable respondent's argument that upon consideration of the pre and postretirement income of the Wachtell Lipton partners, an actuary reasonably could not have assumed a retirement age of 55. Respondent seems to be arguing that given the high levels of partnership income earned by the Wachtell Lipton partners, an actuary reasonably could not have assumed that they would be likely to retire at age 55 when the maximum annual amount permitted under the IDB plans was $ 75,000. This argument is flawed, however, as it is based on the unfounded assumption that the Wachtell Lipton partners would be relying solely on the benefits from the IDB plans for their retirement income. There is no evidence in the *488 record to support such an assumption. At the time of trial, four Wachtell Lipton partners were over the age of 55. Three of those partners are the firm's founding partners -- Leonard Rosen, Herbert Wachtell, and Martin Lipton. Rosen testified that for those partners over the age of 50 at the inception of the IDB plans, the normal retirement age was not 55, but was the later of 15 years of service or 5 years of plan participation. His normal retirement age, as specified in his IDB plan and the actuary's funding assumption, was age 59. Further, Rosen testified that the firm has always been managed informally and been guided by the philosophies and leadership of the founders. A transition to the next generation of lawyers has been slowed by the death of one of the firm's founders in 1989 and the death of the firm's heir apparent in 1991. As a result, the remaining founding partners had to continue their involvement with the firm for longer than had been anticipated at the time of adopting the IDB plans. The record in this case shows that there were certain characteristics of Wachtell Lipton that could have led an actuary reasonably to assume a retirement age of 55. In 1986, *489 Wachtell Lipton was a relatively young firm, having been established in 1965. Nearly three-fourths of the firm's 42 partners were between the ages of 31 and 45, and only one partner was over the age of 55. There existed no formal management directive and no policy as to an appropriate or mandatory retirement age with which to guide an actuary. This absence of a retirement policy also meant that partners at Wachtell Lipton had no constraints upon their decisions about retirement. Actual firm experience showed that prior to the valuation date of the IDB plans for the 1986 plan year, seven partners had left the firm; their ages ranged from 31 to 46. Upon review of this data, an actuary would be reasonable in assuming in 1986 that Wachtell Lipton partners would retire or depart from the firm by age 55. The relatively small size of the the firm and the low ratio of associates to partners reasonably led the actuary to conclude that the partners at Wachtell Lipton become highly involved in any given project. In fact, during the mideighties, the firm routinely operated on a 24 hour a day basis, with round-the-clock secretaries, receptionists, messengers, and other support services. *490 Many of the partners at Wachtell Lipton were "on-call" and had to be available for work 24 hours a day, 7 days a week. Given the demands and stress inherent in such a work schedule, it would be reasonable for an actuary in 1986 to assume a retirement age of 55. We agree with Rabenhorst's determination that one's decision to retire at an earlier age is related to, among other things, his or her financial ability to do so. The record in this case reflects that the incomes of the partners at Wachtell Lipton were substantial. An actuary reviewing income data of partners at Wachtell Lipton in 1986 would be reasonable in assuming an earlier retirement age. Finally, we note that under the terms of the IDB plans, the normal retirement age was 55 and 15 years of service. An actuary is not charged with "rubber stamping" the terms of a plan; however, the normal retirement age as specified in a plan is a factor to be considered by an actuary in arriving at a reasonable retirement age assumption. When the terms of a plan provide that a participant is entitled to a full benefit at a particular age, a prudent actuary must arrive at assumptions which will insure that the promised benefits *491 will be available for the participant at the desired time. It is of no consequence to an actuary, at the time he is making funding assumptions, that the participant actually might not commence receipt of the benefits at the then-stated desired time. Based on the above reasons, we find that an actuary reviewing the philosophy of the founders of Wachtell Lipton; the working environment at Wachtell Lipton in 1986; the firm's actual experience as to partner departures; and the terms of the IDB plans could have assumed reasonably in 1986 that the partners at Wachtell Lipton would retire from the firm at age 55. Preretirement Death Benefit
Each of the Wachtell LiptonIDB plans included insured benefits in the event of preretirement death. To provide for the death benefits, the plans purchased universal life insurance policies. The death benefit would no longer be provided after the plan participant reached retirement. Segal chose the envelope funding method to compute the premium costs for 36 of the plans and chose the premium paid method for 5 plans. Section 1.412(c)(3)-1(f), Income Tax Regs., provides that the cost of certain "ancillary benefits" may be funded by a qualified *492 pension plan. An "ancillary benefit" is defined as a benefit paid as a result of an event which occurs preretirement and which is "detrimental to the participant's health." Sec. 1.412(c)(3)-1(f)(2)(ii), Income Tax Regs. Death is deemed to be an event detrimental to a participant's health, see sec. 1.412(c)(3)-1(f)(2), Income Tax Regs.; thus, a preretirement death benefit such as that provided for in Wachtell LiptonIDB plans falls under the rubric "ancillary benefit". The cost of an "ancillary benefit" may be computed "using the same method used to compute retirement benefit costs under a plan", sec. 1.412(c)(3)-1(f)(1), Income Tax Regs. ("envelope funding"), or "may equal the premium paid for that benefit under an insurance contract", sec. 1.412(c)(3)-1(f)(3), Income Tax Regs. ("premium paid method"). However, as discussed below, an amount equal to a reasonable net premium cost is not deductible under section 404(a)(8) and (e). Preretirement Mortality
Respondent argued that it was unreasonable to assume preretirement mortality in a one person plan because the likelihood of that person's dying prior to retirement is negligible. According to respondent, such an assumption *493 does not produce the "best estimate" of anticipated plan experience. While it is not entirely clear, it appears that respondent also argued that a preretirement mortality assumption was unnecessary because the death benefit was being provided through a life insurance policy and not by the plan. Respondent asserted "the actuary artificially increased the cost of the preretirement death benefit which was already funded through contributions and which would be satisfied from life insurance proceeds." Respondent's expert Poulin supported the argument that there should be no preretirement mortality assumption in a one person plan. He characterized mortality in an IDB plan as an "either/or situation"; that is, the participant either dies before retirement or survives until retirement. Respondent's first argument assumed that the probability of participant's preretirement death is at issue. It is not. As Wachtell Lipton points out, "the actuary's task is not to predict the likelihood of the participant's death; it is instead to compute plan costs." Segal did not establish the preretirement mortality assumption to predict accurately the incidence of preretirement mortality among *494 the plans' participants, but rather used it as a means of estimating the cost of providing life insurance coverage for the preretirement death benefit. Establishment of a preretirement mortality assumption is a necessary step in estimating such a cost. Thus, the use of a preretirement mortality assumption was thus a reasonable method of funding the insured death benefit portion of the plans. Respondent's second argument apparently assumed that use of a preretirement mortality assumption produces "double funding" of the death benefit. Respondent's assertion that the cost of the death benefit was already funded with benefit obligation contributions or would be satisfied from life insurance proceeds is unfounded. The purpose of establishing a preretirement mortality assumption is to determine the cost of the death benefit whether it is provided through the plan or by the purchase of life insurance. Either way, the plan must have the funds necessary to pay the cost. There is no double funding because no other assumption takes into account the cost of the insured death benefit. Use of the 1958 CSO Mortality Table
Segal used the 1958 CSO mortality table to arrive at preretirement *495 mortality assumptions; however, he funded the postretirement liabilities based on assumptions derived from the 1971 and 1983 individual annuity mortality tables (1971 IAM and 1983 IAM tables). The 1958 CSO mortality table is used by insurance companies to estimate the mortality of purchasers of life insurance policies. The 1971 IAM and 1983 IAM tables are used by insurance companies to estimate the mortality of purchasers of annuities. These IAM tables predict a lower rate of deaths than does the 1958 CSO mortality table. There are three basic reasons for this disparity: (1) Human life expectancy improved after 1958; (2) actuarial experience dictates that purchasers of annuities live longer than purchasers of life insurance policies; and (3) insurers build margins for profit and conservatism into mortality tables to ensure solvency when benefits are claimed. This final consideration, commonly known as "loading" the mortality table, necessarily leads to opposite consequences in the sale of life insurance as compared to the sale of annuities. In the case of life insurance, insurers are prone to overestimate the chances of death, but when selling annuities, insurers will generally *496 underestimate the chances of death, thus increasing available reserves for the required payouts under each kind of policy. Respondent argued that Segal's use of the 1958 CSO mortality table was not reasonable in that it overstated the probability of each participant's death, unreasonably inflating each participant's tax-deductible plan contribution. In addition, respondent contended that the use of different types of mortality tables (CSO and IAM) for the same individual was unreasonable and overstated both pre and postretirement liabilities. Respondent's expert Haneberg stated that he found it "troublesome from a professional standpoint" that an IAM table could be adopted for one purpose "while at the same time the plan's enrolled actuary is utilizing a table that predicts between two and three times as many deaths." Haneberg stated that the most accurate predictor of plan participants' preretirement mortality was neither the 1958 CSO mortality table nor the 1971 IAM table, but rather a mortality table developed in 1984 by the actuarial firm, Buck, which assumed fewer deaths at all relevant ages than even the 1971 IAM table. Wachtell Lipton's expert Riebold concluded that it *497 was reasonable for Segal to use the 1958 CSO mortality table to estimate the cost of the preretirement death benefit to the plans and the 1971 IAM and 1983 IAM tables for the postretirement mortality assumptions for those same plans. Because an insurance company would use a CSO-type table in its calculation of the premium cost for the preretirement death benefit and this premium would be a portion of the actual costs for the plan as a whole, Riebold contended that Segal was correct in having done the same. Concomitantly, reasoned Riebold, the postretirement benefit to be paid by the plan was in the nature of an annuity, and thus the appropriate table to be used in estimating mortality in that situation was an IAM-type table to ensure that sufficient reserves are available to fund the defined benefit during participant's retirement. Riebold stated: "it is not considered irregular to use a death benefit mortality table that is different from that used for the Maturity Values of the pension benefits. The determination of pre-retirement mortality involves considerations and objectives that differ from those involved in determining post-retirement mortality." Wachtell Lipton's expert *498 Joss testified that Segal's use of the 1958 CSO mortality table to estimate the cost of the preretirement death benefit was less expensive, and therefore more reasonable than other available funding options. The present value of a preretirement death benefit using an Allstate Insurance Company quote, and using the P.S. 58 rates [13] estimated higher costs than those estimated under the 1958 CSO mortality table. Thus, Joss concluded that the use of the 1958 CSO mortality table to fund the death benefit, the least expensive of these three options, all of which were available to Segal, was reasonable. While Haneberg and Poulin may be correct that the 1958 CSO mortality *499 table overstates what the Wachtell Lipton plans' actual mortality experience will be, this has no bearing on the purpose of Segal's use of the 1958 CSO mortality table, which was not to measure accurately potential participant mortality, but was rather to estimate the life insurance premium expense to each of the plans. In addition, while the actual chances of any one of the participants dying before age 55 may be so low as to be negligible, as Poulin contended, the fact remains that, by definition, a preretirement death benefit assumes some possibility of preretirement death. We believe that Segal was correct in choosing a CSO table to make his preretirement mortality assumptions, as this was the same type of table which would be used by an insurance company in computing the premium it would charge to the plans. While there was a more recent CSO table available to Segal, the 1980 CSO table, which used more current life expectancy figures, it was not contended by respondent's experts that Segal should have used this newer table. In fact, Haneberg, while testifying before the Court, acknowledged that to make a reasonable mortality assumption, one need not use the most recent table *500 available. A mortality table should be used only for the purpose which it is meant to fulfill. A preretirement death benefit has different requirements than does a postretirement annuity. In the case of the former, there must be reserves available if the beneficiary dies unexpectedly soon, and in the case of the latter, there must be reserves available if the beneficiary lives unexpectedly long. What is important is that when the plan participant or his beneficiary requires the funds to be disbursed, they be available. The dual mortality table method devised by Segal legitimately fulfills the funding needs of both a preretirement death benefit and a postretirement annuity. We hold that Segal's use of the 1958 CSO mortality table as a preretirement mortality assumption for the Wachtell Lipton plans providing a preretirement death benefit was reasonable. Deductibility of the Death Benefit Contributions
The universal life insurance purchased by Wachtell Lipton's plans provided for annual term life insurance and an additional cash surrender or cash value portion. The contracts were structured to allocate contributions funding the plans' death benefits between the annual *501 term life insurance premium and the cash value portion. This latter portion, described by Wachtell Lipton's expert Riebold as an "individual level premium reserve portion", is a fund which was structured initially to increase due to allocations from the death benefit contributions, and then to decrease in the future as contributions cease and the fund and earnings on the fund were to be used to pay for the remaining term life insurance coverage. Under section 404(a)(8) and (e), the portion of the contribution allocable to the purchase of life insurance is not deductible. Section 1.404(e)-1A(g), Income Tax Regs., provides as follows: (g) Contributions allocable to insurance protection. Under section 404(e)(3), for purposes of determining the amount deductible with respect to contributions on behalf of a self-employed individual, amounts allocable to the purchase of life, accident, health, or other insurance protection shall not be taken into account. Such amounts are neither deductible nor considered as contributions for purposes of determining the maximum amount of contributions that may be made on behalf of an owner-employee. The amount of a contribution allocable to insurance *502 shall be an amount equal to a reasonable net premium cost, as determined by the Commissioner, for such amount of insurance for the appropriate period. See paragraph (b)(5) of section 1.72-16. Therefore, only the premium attributable to the cash value portion of the universal life policy is deductible; the premium attributable to the term life portion of the policy is not deductible. Wachtell Lipton agreed that death benefit contributions attributable to a reasonable net premium cost are not deductible, and has conceded $ 111,094 in this regard. Apparently, respondent agreed that "in the case of defined benefit plans owning universal life insurance products, the effect of section 404(e) is to deny a deduction only for the net premium cost of the benefit as set forth in [Income Tax] Reg. sec. 1.404(e)-1A(g)." However, because of the structure of the life insurance policies purchased by the Wachtell LiptonIDB plans, respondent argued that even the cash value portion of the insurance premiums were not deductible. Respondent asserted that any part of the cash value portion eventually used to pay the cost of insurance coverage is nondeductible under the section 404(a)(8) and (e) *503 prohibition. We disagree. The future use of death benefit contributions allocable to the cash value portion of the universal life insurance product does not affect its otherwise current deductibility. To the extent that any such portion is used to pay future term life insurance premiums, that amount is includable in the income of the participant in that year. Such use of the cash value portion is equivalent to a personal expenditure on a nondeductible item (in this case, term life insurance) in a future year. This treatment is consistent with the treatment of future benefit distributions which are taxed upon distribution, with after-tax dollars expended in any way the participant desires. The critical computation is the determination of an amount equal to a "reasonable net premium cost" under sections 1.404(e)-1A(g) and 1.72-16(b)(5), Income Tax Regs. Since we have dismissed respondent's arguments regarding the probability of death in an IDB plan, Segal's use of the 1958 CSO mortality table, and the current deductibility of otherwise deductible death benefit contributions, this is the only remaining issue. Respondent argues that section 1.72-16(b)(5), Income Tax Regs., is *504 not controlling despite the express reference to it by section 1.404(e)-1A(g), Income Tax Regs., because it was aimed at the situation of an employer providing insurance coverage through a "group policy". Respondent cites no authority for this proposition, and the argument fails. As section 1.72-16(b)(5), Income Tax Regs., makes clear, the term "reasonable net premium cost" refers to the reasonable premium cost of an amount of insurance less any cash value inherent in the policy. Nothing in that section indicates that its scope was intended to be restricted to any particular type of insurance policy, defined benefit pension plan, plan sponsor, or participant. We hold that Wachtell Lipton's death benefit contributions calculated using the 1958 CSO mortality table to estimate preretirement mortality for the year at issue were properly deductible to the extent that they exceed a reasonable net premium cost of providing life insurance for that period within the meaning of sections 1.404(e)-1A(g) and 1.72-16(b)(5), Income Tax Regs. We leave that calculation to the parties under Rule 155. Expense Load
Preretirement
Segal established a 7.5-percent preretirement expense load *505 assumption to cover certain contingencies. Wachtell Lipton's expert Riebold stated that a preretirement expense load assumption is reasonable for an IDB plan that provides for a preretirement death benefit. In her opinion, such preretirement loading in this context appropriately covers contingent shortfalls such as an insurance policy's denying full benefits because of preexisting conditions or other contract limitations or exclusions, as well as increased premiums, part of which are allocated to the deductible cash value portion. Respondent contended that a preretirement expense load assumption is not reasonable. Respondent argued that there was no need to provide for the possibility that the full benefit would not be paid because in 1986, the plans had already purchased insurance policies that had no limitations. In addition, respondent asserted that it was not necessary to anticipate future increases in premiums because premium payments are not deductible. Respondent also maintained that the use of the 1958 CSO mortality table was sufficiently conservative as to provide an adequate cushion for any contingencies. Furthermore, respondent claimed that there was no need for *506 a preretirement expense load because Wachtell Lipton paid plan expenses during the preretirement period. Finally, apparently believing that Wachtell Lipton asserted that the preretirement expense load was justified by mortality improvement, respondent argued that mortality improvement had already been accounted for in the mortality tables used by Segal. Although there is some merit to respondent's arguments, respondent failed to recognize certain important factors. The insurance policies in effect in 1986 were not without limitation. For example, the death benefits were significantly limited in the event of a suicide within 2 years of purchasing the policy or within 2 years of any increase in the amount of the policy. Nevertheless, even if the insurance policies owned in 1986 were without limitations, the plans had the option of changing policies or even carriers. Such new policies might have included limitations which the then-current policies did not contain. Respondent's argument regarding nondeductibility of premium payments failed to recognize that a portion of the premium payments -- that part allocated to the cash value -- is deductible. Respondent's assertion that the *507 preretirement expense load is not necessary because the firm was paying plan expenses confuses the purpose of the preretirement expense load with that of the postretirement expense load. Wachtell Lipton never claimed that the preretirement expense load was needed to provide for plan expenses. Moreover, respondent's argument regarding mortality improvement also addressed an argument which Wachtell Lipton never made. We agree with respondent that use of the 1958 CSO mortality table may have provided some cushion for contingencies. However, as we noted above, the actuarial experts recognized that the 1958 CSO mortality table was a valid table, in and of itself, without taking into account any contingencies. We are not entirely convinced that the 7.5-percent preretirement expense load assumption is completely reasonable. We find, however, such an assumption is not substantially unreasonable so as to justify a retroactive adjustment. Furthermore, any misgivings we have about this assumption are not sufficient to impact the reasonableness of the actuarial assumption in the aggregate. Postretirement
Segal established a 5-percent postretirement expense load factor for 5 of *508 Wachtell Lipton's plans and a 7.5-percent postretirement expense load factor for the remaining 36 plans and used that assumption in calculating the required contribution for the year at issue. A postretirement load factor is used by actuaries to provide for plan expenses that will be incurred in the postretirement period of the plan. As with all the other actuarial assumptions, there is no single correct percentage for all plans. Riebold listed the types of expenses the plans were likely to incur, including trustee, investment, actuarial, accounting and legal fees, and costs related to plan amendments and legislative compliance. She noted that in 1984 the certifying actuary would have known that these expenses were on the rise and indicated that, in fact, the 5-percent or 7.5-percent load likely would be insufficient to provide for all of the expenses the plans would incur. She testified that postretirement expenses could reach as high as 12 percent or 15 percent. Joss explained that an expense load is a generally accepted actuarial technique and that it is a technique contemplated by respondent, as Schedule B of Form 5500 specifically provides for disclosure of any expense load. *509 Moreover, Joss noted that for small plans, administrative expenses are significant in relation to assets, and such expenses were on the increase throughout the eighties. Joss concluded, "Certainly, it was appropriate for the actuary to be concerned about payment of these expenses and it was reasonable for him to provide for their payment from plan assets." Respondent argued that since each plan participant is a cotrustee, there would be no trustee expense. In addition, respondent contended that investment expenses should not be considered to be part of the expense load because those expenses merely reduced the investment return. Respondent also asserted that actuarial expenses would be minor because the law only required actuarial valuations every 3 years. Finally, respondent maintained that compliance costs would be minimal, if they existed at all, because all of the plans were identical, and compliance could be obtained through uniform amendments written for all of the plans. Respondent assumed that because Wachtell Lipton would have to amend the plans for nonretired partners, the firm would charge little or nothing to amend the plans of retired partners. Poulin asserted *510 that the plans' postretirement expenses would consist only of costs related to the issuing of the benefit check and "minimal actuarial, legal or accounting expenses." He stated that those expenses would be minor and therefore could be ignored by the actuary when determining the required contribution. Haneberg, respondent's expert, conceded that it would be reasonable to anticipate that the firm would not pay postretirement administrative expenses for the IDB plans. However, he noted that at the time, the law only required actuarial valuation every third year, which reduced possible postretirement administrative expenses. He concluded that the expense load assumption was "on a spectrum between Trivially Understates (for the relatively small asset accumulation) to Overstates (for the plans anticipating relatively large asset accumulations.)". Nevertheless, at trial, he conceded a 2-percent expense load to account for postretirement expenses was reasonable. We do not agree with respondent's contention that there should be no expense load assumption. There is sufficient evidence to support the conclusion that the plans will incur significant postretirement expenses. Respondent *511 ignored the existence of the other cotrustee who, presumably, would not donate such services free of charge. Furthermore, there was no evidence that an actuary would consider investment expenses to be part of the investment return analysis rather than part of the expense load analysis. In fact, Haneberg excluded such transactions costs from his interest rate assumption analysis, thereby indicating that such costs should be accounted for elsewhere. In addition, some allowance for actuarial expenses was appropriate. We note that Segal was making valuations yearly, rather than every 3 years as respondent assumed he would. Nevertheless, even if the actuarial valuation were only made every 3 years, allowance must be made for that expense since the actuary is not likely to perform his service without charge. Finally, respondent presented nothing that compels the conclusion that Wachtell Lipton would always provide free administrative and compliance services. The partners and associates who would provide such services would have little connection with retired partners or incentive to provide such a benefit to those retirees. We believe that it is completely reasonable to assume that *512 the plan will be responsible for administration costs during the postretirement period. We hold that the 5- and 7.5-percent expense load assumptions were reasonable and appropriate in light of the significant postretirement expenses the plans are likely to incur. Best Estimate
Respondent asserted that the "best estimate" test of section 412(c)(3) constitutes a separate and distinct element requiring that selection of assumptions be founded on the actuary's "highest degree of professional judgment". Respondent intimated that the "best estimate" language of section 412(c)(3) imposed a separate and higher duty in the selection of actuarial assumptions. While the argument is not entirely clear, respondent suggested that since each of the assumptions should offer the best estimate of anticipated experience under the plan for which assumptions are being established, the actuary should not rely on comparisons to the actuarial assumptions used by other plans. Respondent also argued that since the actuary must exercise "the highest degree of professional judgment" in choosing actuarial assumptions that are the "best estimate" of anticipated experience under the plan, he or she should *513 not be concerned with actuarial conservatism. Respondent supported this contention by pointing to the lack of express statutory recognition of actuarial conservatism, noting that if Congress were concerned with actuarial conservatism, "it undoubtedly would have said so." We find no merit in respondent's arguments. As discussed earlier, we believe that Congress was concerned with adequate funding of pension plans. In choosing to leave selection of pension plan assumptions to enrolled actuaries, Congress must have been aware of the basic tenets of actuarial science, including actuarial conservatism, and designed the statutory structure with them in mind. Furthermore, we do not read the "best estimate" statutory language as somehow preventing an actuary from making comparisons to other plans that in his judgment reflect the actuarial mainstream. Since Congress must have recognized that there would be a range of reasonable assumptions, and since actuarial calculations require a single value for each assumption, a particular assumption would have to be chosen from each reasonable range. That choice is to be the actuary's best estimate. Thus, the "best estimate" language accommodates *514 the mathematical realities of actuarial calculations without imposing a higher or stricter standard on the requirement that the actuarial assumptions be reasonable in the aggregate as respondent implies. The ultimate inquiry remains whether the assumptions chosen are reasonable in the aggregate in combination with all actuarial assumptions. Conclusion
We find that each of the challenged assumptions was reasonable, and the actuarial assumptions and methods used by Wachtell Lipton were reasonable in the aggregate. A fortiori, these assumptions are not substantially unreasonable so as to permit retroactive changes of assumptions for years prior to the year in which the audit is made. We further find that the actuarial assumptions and methods certified by Wachtell Lipton's enrolled actuary in combination offer the actuary's best estimate of anticipated experience under the plans. Decision will be entered under Rule 155. Footnotes
1. F.S.A.: Fellow of the Society of Actuaries. The society is a certification organization for actuaries, which administers exams to demonstrate educational qualifications. The society also conducts and publishes studies concerning mortality and health risks. "Fellow" is the society's highest designation; to be so designated, one must pass a full syllabus of examinations. ↩
2. M.A.A.A.: Member of the American Academy of Actuaries. The highest (and only) designation in that organization. The American Academy of Actuaries issues standards of practice and sets discipline procedure for the actuarial profession. ↩
3. E.A.: Enrolled Actuary. Actuaries may be "enrolled" by the Joint Board for the Enrollment of Actuaries, a certifying organization composed of members appointed by the Secretaries of the Treasury and of Labor, which was established in 1974 pursuant to the Employee Retirement Income Security Act of 1974 (ERISA), Pub. L. 93-406, 88 Stat. 829, 1002. ERISA requires that defined benefit plans be audited annually on behalf of their participants by an actuary so enrolled. This actuary makes funding assumptions for the plans and certifies as to the reasonableness in the aggregate of those assumptions. ↩
4. F.C.A.: Fellow of the Conference of Consulting Actuaries. The highest designation in that organization. Fellowship requires 12 years of responsible actuarial work. All members are consultants, as distinguished from insurance company actuaries.↩
5. Form 5500 is a report filed with Labor, the Service, and Pension Benefit Guaranty Corp. by all ERISA-qualified (i.e., tax-qualified) pension plans. Form 5500 contains information such as interest rate assumptions, actual rates of return, and plan funding status.↩
6. B.B.A.: Bachelor of Business Administration. ↩
7. C.F.A.: Chartered Financial Analyst. This designation is awarded after one has taken a series of examinations in portfolio management, security analysis, and investments and has passed certain experience and ethical requirements.↩
8. LTV, Eastern Air Lines, and Pan American Airlines are among the well-known, underfunded defined benefit pension plans to terminate leaving the Pension Benefit Guarantee Corp. (PBGC) to cover the underfunded benefit obligation. A Nov. 25, 1991, PBGC news release reported that the 50 largest underfunded pension plans were underfunded by $ 14.2 billion in 1990, up 50 percent from 1989.↩
9. Sec. 412(c)(3) requires the actuarial assumptions to be reasonable in the aggregate "taking into account the experience of the plan" as well as reasonable expectations for the future.↩
10. Consistent with this conclusion, computer data expert, Schechter, confirmed that for 76.6 percent of the preretirement assumptions and 82.5 percent of the postretirement assumptions, actuaries established interest rate assumptions of between 5 percent and 6 percent for 1986 plans with fewer than 100 participants. Schechter's conclusions were based on his analysis of data obtained from Labor. ↩
11. Joss provides confirming data obtained from Labor showing that plans with fewer than five participants earn a median return of 5 percent in 1988, while the median return for larger plans (100 or more participants) is upwards of 8 percent for the same period. Respondent's computer data expert, Borden, questioned the magnitude of the difference in rates of returns earned by small and large plans but confirmed that, in general, "smaller plans would tend to have lower rates * * * [of return] than larger plans."↩
12. The four contingencies in question are as follows: (1) A 1986 congressional warning about 5-percent investment rate assumptions; (2) a 1985 Financial Accounting Standards Board statement regarding "best estimate" assumptions; (3) continuing favorable investment results between 1984 and 1986; and (4) 3 years of very favorable investment experience.↩
13. The P.S. 58 rates are those rates deemed by the Commissioner to be acceptable in determining the cost of life insurance protection includable in gross income for a participant covered by a life insurance contract held in a qualified pension plan. Rev. Rul. 55-747, 1955-2 C.B. 228. See also sec. 1.72-16, Income Tax Regs.↩